ROGERS, J.
 

 The Marine Bank
 
 &
 
 Trust Company and the Gulf Naval Stores Company, Inc., jointly brought separate suits against four insurance companies to recover, in the aggregate, $36,-259.10, with interest and penalties, for the alleged loss by fire of 42,484 gallons of turpentine stored in three tanks leased by the Southern Bonded Warehouse Company from the naval stores company. Subsequently, the plaintiff bank was merged with the Canal Bank
 
 &
 
 Trust Company, and the latter was substituted for the former as a party plaintiff.
 

 The suits were consolidated and tried as one case in the court below, resulting in a judgment in each case in favor of the plaintiff bank as prayed for. This appeal is by the Home Insurance Company, one of the defendants, from the judgment against it in the sum of $25,849.77, with interest, 10 per cent, additional on the principal and interest as attorney’s fees, and an additional 12 per cent, on the principal as damages, together with costs.
 

 The Canal Bank & Trust Company, the judgment creditor, has answered the appeal, asking that the statutory damages of 12 per cent, be awarded on the interest as well as on the principal of its judgment, and that the award of 10 per cent, on the amount of the judgment as attorney’s fees be increased to 15 per cent.
 

 
 *196
 
 No question is made by the appellant of the issuance of the policy nor as to the proofs of loss being seasonably furnished' by the «appellees. The sole defense relied on to defeat plaintiffs’ claim is that the turpentine .for the alleged loss of which recovery is sought was not on the premises owned by the naval stores company in the tanks leased by the warehouse company and, consequently, was not destroyed by the fire. Therefore the issue presented for determination is essentially one of fact.
 

 The salient facts, with our comments thereon, are as follows, viz.:
 

 The Gulf Naval Stores Company, Inc., prior to 1926 was a borrower on collateral, from time to time, of various sums of money from the Marine Bank & Trust Company. The collateral pledged to secure these loans consisted of warehouse receipts issued by the Southern Bonded Warehouse Company, a subsidiary of the naval stores company ¡ covering oil stored in tanks situated in the square bounded by Bernadotte, Baudin, Julia, and St. Patrick streets, in the city of New Orleans. This square of ground was owned by the naval stores company, and both the plant of that company and the plant of the warehouse company were located on the property.
 

 • On September 13, 1926, a fire occurred, ■which destroyed a quantity of turpentine stored ,on the premises in question. At the time of this fire the naval stores company .owed the Marine Bank & Trust Company on notes the sum of $51,068.68. These notes were secured by the pledge of the receipts of the .warehouse company, calling for 51,106 gallons of turpentine, and by the policies of the -defendant and other insurance companies in;suring the,turpentine in the sum.of $61,000, with a loss payable clause thereto attached in favor of the bank as it's interests might appear. .
 

 Plaintiffs claimed a loss by reason of the fire of 42,484 gallons of turpentine, which was pledged to the Marine Bank & Trust Company, of the value of 85 cents per gallon, or a total monied loss of $36,249.10, which was found to be correct by the court below.
 

 The turpentine that was consumed by the fire was stored in tanks Nos. 2, 4, and 5, each of , the capacity of 15,000 gallons. This was gqm .turpentine. There were also on the yard, in tank No. 3, at the time of the fire, 13,000 gallons of wood turpentine belonging to the Gay-Hammell Company. Tank No. 1 was filled with pine tar which had 'been stored therein some time during the previous summer.
 

 Due to the fact that the business in which it was engaged had become unprofitable, the naval stores company virtually ceased operations subsequent to the year 1925. About the middle of the year 1926, the company had practically disposed of all its turpentine not covered by the warehouse receipts. These receipts had been held by the bank under its pledge for a considerable period of time, and, because of unfavorable market conditions, it was deemed advisable by the interested parties that they should hold the turpentine covered by the receipts in- storage until the market price of the commodity would advance. .
 

 Pending the expected rise in the market, in order to facilitate the handling and checking of the turpentine, which was distributed about the storage yard'in various containers ■used for the purpose by the warehouse company, the bank requested that the turpentine be collected and refined, some of it being a .little off-color, and placed in the storage •tanks. There is direct testimony in the record showing this was done and that the tur
 
 *198
 
 pentine was placed in tanks Nos. 2, 4, and 5. The witnesses who testified to this effect were Dunwoody, the president of both the naval stores company and the warehouse company, who supervised the work, and two negro employees who actually did the work. According to these witnesses, the task of collecting and refining the turpentine was begun in June, 1926. The filling of tank No. 5 was completed about three weeks prior to the fire. The filling of tanks No's. 2 and 4 was almost completed some time before the fire, and was actually completed on September 11, 1926, two days previous to the fire. The three tanks were gauged by Dunwoody while they were being filled and after the filling had been completed, and each was found to contain on strict measure not less than 14,500 gallons of turpentine.
 

 The testimony of Dunwoody as to the quantity of turpentine that was collected and placed in the tanks and which was on hand at the time of the fire is corroborated by the testimony of W. N. Fisher. This witness, as the representative of the New Orleans Clearing House, of which the plaintiff bank was a member, examined and cheeked the turpentine stored on the yard of the warehouse company in the month of May, 1926. This was something less than four months before the fire occurred. The report of Mr. Fisher under date of May 25, 1926, is in the record. This report and the testimony given in connection therewith show that the witness checked the warehouse receipts against the turpentine, which was stored at the time in various tanks, tank cars, and drums on the premises of' the warehouse company, 'and that the amount of turpentine on hand at that time was 48,905 gallons.
 

 Further corroborative evidence of the amount of turpentine on hand when the fire took place is ¡furnished by an audit made of the books of the naval .stores company by Archie M. Smith, a certified public accountant. This audit was made in March, 1928, at the request of the plaintiff bank, and covered a period of two years, namely, from September 13, 1924, to September 13, 1926, the date of the fire. The audit, which was based on the original documents, shows that the quantity of turpentine on hand on the date last mentioned was 46,255.44 gallons. ; .
 

 The defendant insurance company contends that the books of the naval stores company do not reflect the true situation regarding the amount of turpentine stored in the tanks at the time of the fire. In support of its contention the insurance company points out certain fictitious entries appearing in the books relative to sales and purchases of the products handled by the naval stores company. The testimony discloses that as far back as the year .1924 it was the annual practice of the naval stores company to enter on its books.certain washout sales with a view of apparently decreasing its stock on hand and increasing its accounts receivable so as to escape, the- payment of state and municipal taxes. Thus, the books of the naval stores company shows the entry of an alleged sale of 80,000 gallons of turpentine in the month of December, 1925, and the entry of an alleged purchase-of 80,-000 gallons of turpentine in the month of January, 1926.
 

 The practice referred to is not to be commended, even though, as the testimony shows, because of business exigencies, it was- the common practice of dealers in naval stores in order to escape taxation. Nevertheless, so far as the ease before us is concerned, the washout sales of December, 1925, and January, 1926, in no way affected the quantity of turpentine in the possession of the naval stores, company. The -so-called sales and-purchases were entered on the-company's
 
 *200
 
 books at tbe cost price of tbe turpentine, which, remained untouched in the storage tanks on the yard. So that while the inventory of January 1, 1926, purports to show that the amount of turpentine on hand on that date was 20,570 gallons, there were actually on hand at the time 100,570 gallons, which were shown on the books when the purported sale of 80,000 gallons of turpentine in December, 1925, was balanced by the purported purchase of 80,000 gallons of turpentine in January, 1926.
 

 The income tax return of the naval stores company covering the year 1925 reports 20,-570 gallons of turpentine in the possession of the company as of date December 31, 1925. The defendant insurance company infers from this that, instead of 43,662 gallons of turpentine being on hand at the time of the fire, there was none. This inference must yield, however, to the facts as disclosed by the testimony. The income tax return was made from the books of the company, which, after the washout sale of 80,000 gallons of turpentine in December, 1925, was entered, showed that the amount of turpentine on hand was 20,570 gallons. But as no sale was made' of turpentine, and the washout sale and purchase of the 80,000 gallons' of turpentine were entered at the cost price of the merchandise, no profit, actual or paper, accrued to the naval stores company, rendering it liable for an income tax. When, as hereinbefore stated, the washout purchase of 80,000 gallons of turpentine in January, 1926, was entered on the company’s books, the amount of turpentine on hand, as reflected by the books, was 100,-570 gallons instead of 20,570 gallons.
 

 The right of the federal government to an .income tax. was in no manner affected by the return made by the naval stores company. The return showed a loss for the year 1925, and the result would not have been different even if the 80,000 gallons of turpentine covered by the washout sale had been included in the inventory.
 

 The defendant insurance company does not question the honesty of the report made in May, 1926, by W. N. Fisher, the representative of the New Orleans Clearing House Association, but suggests the probability that there was only a small quantity of turpentine in the containers at that time, which was made to appear larger because the president of the naval stores company had filled the containers with water, causing the turpentine to float on the surface. The suggestion is based on a mere surmise of the defendant and is not supported by any testimony in the record.
 

 The defendant insurance company has questioned the correctness of the books of the naval stores company as to the amount of turpentine on hand because of plaintiffs’ admission that the sale on August 25, 1925, of 25 drums of pine oil and
 
 49
 
 drums of turpentine sold to Marshall Dill Company, of San Francisco, does, not appear in the purchase and sales account.
 

 The explanation offered by the president of the naval stores company for the failure of the books of the company to show this transaction is that the shipment in question was not made by the Gulf Naval Stores Company from its stock, but from the United States Turpentine Company, Inc., of Douglass, Ga. We think the explanation is sufficient to show that the transaction was not one which should have been entered on the books of the naval stores company.
 

 There are in evidence certain telegrams and letters sent by the president of the naval stores company to Marshall Dill Company, of San Francisco, about, two. months before the
 
 *202
 
 fire occurred. These documents refer to the desire of the sender to clean up the old stock and to the fact that he had left about 100 drums. The defendant insurance company contends that these documents show that there was no such quantity of turpentine on hand at the time of the fire as is claimed by the plaintiffs.
 

 However, the testimony on behalf of the plaintiffs discloses that the naval stores company had virtually disposed of its entire stock except the turpentine that had been pledged to the bank and a few odds and ends that were lying about the yard. Neither the naval stores company nor the bank desired to sell the pledged turpentine at the prevailing market prices, which would have entailed a considerable loss. Hence this turpentine was concentrated in tanks Nos. 2, 4, and 5 to await the expected rise in the market, when it could be sold for a sound price. The old stock referred to in the telegrams and letters in question were the odds and ends of the naval stores company’s stock that had not been pledged to the bank. The testimony is reasonable and amply refutes the contention of the defendant insurance company.
 

 The defendant insurance company finally contends that the circumstances surrounding the fire and the established facts relating thereto show conclusively that it was impossible the fire could have burned up 42,648 gallons of turpentine belonging to the naval stores company, 13,000 gallons of turpentine belonging to the Gay-Hammill Company, stored in tank No. 3, and 12,000 gallons of pine tar belonging to Eisemann & Co., stored in tank No. 1, in the time and in the manner claimed by plaintiffs.
 

 On the question of the character, extent, and duration of the fire and of the quantity of turpentine destroyed thereby, much evidence was adduced and an enormous record was built up. Many witnesses testified to facts directly bearing upon the fire, and a number of experts gave their opinions as to the amount of the turpentine and pine oil actually consumed. In connection with the expert testimony, certain experiments were made in the presence and for the benefit of the judge of the district court.
 

 The conclusion of the judge of the district court, as set forth in his written reasons for judgment, after listening to the testimony and watching the experiments made for his benefit, was that the plaintiffs had made out their case by a preponderance of the evidence. We have carefully read the record, and, without attempting to analyze the mass of evidence appearing therein, which, after all, would serve no useful purpose, have reached the same conclusion.
 

 Under Act 168 of 1908, the court below awarded the plaintiff bank 12 per cent, of the amount of its loss as statutory damages. In its answer to the appeal of the defendant insurance company, the plaintiff bank contends that the penalty should be calculated on the interest as well as on the principal of its judgment. The contention is not well-founded. Section 3 of Act 168 of 1908 provides, in part, as follows, viz.: “* *
 
 *
 
 Should the company fail to pay * * * the amount due the insured under the policy after demand made therefor, such company shall be liable to pay the holder or holders of such policy in addition to the amount of the loss, 12 per cent damages on the total ’amount of the loss as may be determined by a court of competent jurisdiction. * * * ”
 

 The plain meaning of the statute is that the 12 per cent, damages stipulated therein should be calculated only on the principal of the debt resulting from the insured’s loss as
 
 *204
 
 determined by the court. The interest of 5 per cent, awarded .by- the judgment forms no part of the loss. It is merely a penalty imposed -on the- judgment debtor under the law for its delay in paying the amount of the loss.
 

 ■ Plaintiff and appellee cite Thompson v. State Assurance Co., 160 La. 683,107 So. 489. In that case, this court; in amending and recasting the judgment appealed from, apparently imposed the statutory penalty of 12 per Gent, on the amount of tjie loss plus the interest thereon. However, no issue was made there of .the proper manner of applying the statutory penalty. Hence, the case is not authority for appellee’s contention.
 

 ... I-3-] The plaintiff bank also prays in its answer to the appeal for an increase in the award of attorneys’ fees. We do not feel warranted in granting its prayer. The principal of the judgment is large, and the attorneys’ fees based thereon represent a considerable 'sum, which we are not prepared to say is not a reasonable allowance for the prosecution of plaintiff’s case.
 

 . Eor the reasons assigned, the judgment appealed from is affirmed at" appellant’s cost.